## MIDLAND VALLEY RAILROAD CO. v. WATIE.

No. 23812.   June 18, 1935.

Rehearing Denied Dec. 24, 1935.

O. E. Swan, for plaintiff in error.

Watts & Wall and W. A. Carlile, for defendant in error.

CORN, J.  This action was instituted in the district court of Sequoyah county on September 11, 1931, and is an action under the Federal Employers' Liability Act to recover damages for injuries plaintiff claimed he sustained by reason of negligence of the railroad company.  In the trial court Lee Watie was plaintiff and Midland Valley Railroad Company defendant, and they will be so designated herein.

The material part of the petition is as follows:  That on and before the 17th day of September, 1929, plaintiff was in the employ of the said defendant as a section hand, to work on and about the track of the defendant's railroad near the town of Briartown in the county of Muskogee; on said date said defendant had in its employ in and about said track and business and at said place several men besides plaintiff, engaged in the common employment of taking up old steel railroad tracks of said defendant at said point and loading the same upon a flatcar, which was coupled to a boxcar of defendant's work train being used in said work; and said work train on said date was being operated between Muskogee, Okla., and Hartford, Ark.; said plaintiff and said men were under the control and direction of one G. W. Smith, section foreman, and one Frank Hawkins, roadmaster, of said defendant company; on said day and at said time and place, while in the proper exercise and discharge of his duties under said employment, plaintiff, with other employees of said defendant, was directed by said foreman to stand upon the coupler between said flatcar and said boxcar and line up the old rails with a lining bar as they were taken up from the track and loaded upon said flatcar; each of said rails weighed about 715 pounds, and while so engaged, and without fault on his part, one of said steel rails was, without warning to plaintiff, carelessly and negligently thrown by said employees of defendant, who were assisting in loading said rails, with great force and violence against the lining bar which plaintiff was holding in his hands and using, driving said lining bar against the left side of plaintiff's head behind his

left ear, knocking him off said coupler, causing him to fall upon his head, neck, and shoulders beside defendant's railway track; plaintiff was then and there by said blow rendered unconscious; plaintiff's skull, brain, and medulla oblongata, spinal cord, and neck and shoulders were greatly and permanently injured; as a result thereof, plaintiff has suffered great and excruciating pain in his neck and shoulders, and more particularly in his head, has been unable to control the movements of his body, has been unable to stand or walk correctly, and has become subject to seizures of vertigo and sudden loss of consciousness; the said injuries so sustained by him were caused through the negligence and carelessness of the said agents and employees of defendant; said employees were wholly incompetent to perform such service with due care and safety, which facts were well known to defendant and wholly unknown to plaintiff; and the said agents were employed and directed to perform such service with plaintiff without due regard to plaintiff's safety; by reason of his injuries plaintiff was put to necessary and reasonable expense in endeavoring to be healed and cured of said injuries and wounds aforesaid, to the amount of $30; that he has suffered and still suffers great and excruciating bodily pain and has undergone great humiliation, mental suffering, and worry; and he has been deprived of the means of earning a livelihood and has suffered a permanent injury to his head, brain, medulla oblongata, spine, neck, and shoulders; plaintiff was born June 26, 1893, was at the time of said injury 36 years, two months and 22 days of age and had an expectation of life of approximately 30.35 years; he was earning and receiving from defendant at the time of said injury the sum of $14.40 per week, and has been damaged by defendant through its carelessness, negligence, and mismanagement as aforesaid, through loss of his earning power, in the total sum of $22,726.08, and prayed judgment for that amount.

The defendant answered with a general denial and pleaded as a further defense that even if the plaintiff was injured at the time and place in the manner alleged in his petition, plaintiff was guilty of carelessness and negligence which directly and proximately contributed thereto, and without which said injuries would not have been sustained, and if the plaintiff had received injuries, they were the result of the risks of his employment which he assumed; and as a further defense, Lee Watic, for and in consideration of his re-employment by the defendant, Midland Valley Railway Company, made and executed his written release and discharge from all and on account of any and all damages, or claim for damages, occasioned by or resulting from said injuries, or that might in any way result therefrom, and defendant states that plaintiff is barred from maintaining this action.

To said answer the defendant replied, denying all the material allegations of new matter set forth in the answer of the defendant, and specifically denies that he was guilty of carelessness and negligence which directly or proximately contributed to the injury suffered by him, and that he assumed the risks of acts of carelessness and negligence on the part of the defendant as alleged in said answer.

And admits that on the 17th day of September, 1929, he executed a release to defendant of the injury complained of by him in his original petition, as alleged in defendant's answer, but denies that he is bound thereby for the following reasons, that: At the time, he was suffering great pain and anguish caused by the injuries as alleged in his petition, and said release was presented to him by one G. W. Smith, section foreman for defendant, and his immediate superior in the employment, at which time and during which he was injured through the carelessness and negligence as alleged in his original petition; he had already been taken to a physician in the employ of defendant, who had given him some slight treatment for said injuries. The said G. W. Smith, at the time he presented to plaintiff said release, represented to plaintiff that he, the said Smith, had been informed by said physician that plaintiff's injuries were very slight, and of no consequence, and plaintiff would be entirely recovered within a very short time, and if plaintiff did not execute said release, he would be immediately discharged from the services of defendant. The said Smith and the defendant railroad knew, or could have known, that the representations of the said Smith to plaintiff, relative to his injuries, were false and untrue. Such representations were made to plaintiff with the intent to deceive, cheat, and defraud plaintiff, and with an intent to deny him compensation for the injuries he had suffered. In addition to being in a dazed and unsound state of mind and in a state of intense pain, anguish, and suffering in and about his head, neck, and shoulders, plaintiff was

404

ignorant of his true condition, believing and relying upon the representations of the said Smith and the defendant company as was intended he should, and executed said release; and that the consideration for said release was the sum of $1, which plaintiff hereby tenders back to defendant.

Thus issues were joined and tried to a jury, which returned a verdict in favor of the plaintiff for the sum of $2,000, and judgment for that amount was rendered by the court.

This action is brought under and governed by the applicable provisions of what is commonly termed the Federal Employers' Liability Act (Act of April 22, 1908, c. 149, 35 Stat. 65, U. S. C. title 45, secs. 51, 53, 54, and 56), establishing the rights, obligations, and liabilities of common carriers by railroad while engaged in interstate commerce for injuries received by their employees while employed by such carriers in such commerce. Section 51 provides in substance that the employer shall be liable to such injured employee:

"* * * For such injury * * * resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier. * * *"

Section 53, with reference to contributory negligence of such employee, provides:

" * * * The fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee. * * *"

It is well settled by prior decisions of this court and of the Supreme Court of the United States that in an action brought to recover under this statute, the rights and obligations of the parties depend upon its terms and provisions, and applicable principles of common law, as interpreted and applied in the federal courts, as that statute, as interpreted by the Supreme Court of the United States, is the supreme law to be applied by all courts, federal and state, and all state constitutional and statutory provisions which are in conflict with said federal act are suspended and annulled. Mondou v. New York, N. H. & H. R. Co., 223 U. S. 1, 56 L. Ed. 327; Chesapeake & O. R. Co. v. Kuhn, 284 U. S. 44, 76 L. Ed. 157; St. Louis & S. F. R. Co. v. Snowden, 48 Okla. 115, 149 P. 1083; Pryor v. Chicago, R. I. & P. Ry. Co., 170 Okla. 158, 39 P. (2d) 563.

Lee Watie, plaintiff, testified substantially as follows: That he lived at Sallisaw, Okla., and was 38 years old; had lived at Sallisaw since 1908 or 1909; he was a section laborer or section hand from about July 2, 1911, to the 17th day of September, 1929 (the date of the injury complained of); at the time of his injury he was working as a section laborer for the defendant near Briartown in Muskogee county, taking up old rails and loading them on a flatcar; the work train was made up at Muskogee, Okla., went to Hartford, Ark., and worked both ways; his work train passed through Briartown, Stigler, and Panama that night and went out of there next morning and worked on to Hartford, Ark., and back to Muskogee; G. W. Smith was foreman of the gang in which he was employed; and he was told by the foreman to get a lining bar and line the rails up straight on the flatcar if one should fly crooked; they were loading some old rails and he, the foreman, was giving instructions to the gang, and he would say, "Put your hands on it"; then, "Pick them up"; and they would pick them up and he would say, "Walk away," and they walked to the side of the car; and "Head high", and they raised them up; and "Throw them away", and they would throw the rails on the flatcar; Mr. Smith, the foreman, was on the other end of the car helping him straighten the rails; he was facing west and the gang was loading the rails from his right-hand side or the north side of the track; there was a boxcar coupled to the flatcar on which the rails were being loaded; the boxcar was behind him and he was standing on the coupling between the boxcar and the flatcar; Mr. Smith had told him to stand there on the coupling, and the flatcar was in front of him; that Mr. Smith was at the other end of a flatcar coupled to the flatcar on which the rails were being loaded, also lining up the rails; and he (Watie) was standing on the coupling between the boxcar and the flatcar and he did not have any clearance; the gang pitched a rail and the rail struck his lining bar, which was sitting on the knuckle pin; he did not remember in just what position he was standing, but was on the coupling without much clearance; when he felt the rail hit his bar, he threw his head around, and the bar struck him on the left side of the head, knocking him off the coupling from between the cars and he fell on the ground, and the next thing he remembered he was sitting down by the side of the car where he fell; he had his lining bar in the same position he had when the other rails were loaded; he was watching the rails on the car and

was not paying any attention to the rail the boys were coming up to the car with, and when they threw the rail the first feeling he had the rail was going to strike him was the jar on the bar; he was performing his duty and was not watching whether the men were bringing that rail down closer, to him than the others; his duties came in between their duties and the best thing for him was to watch his footing or his clearance because he had to work on the coupling; he could tell that the men brought the rail that struck him closer to him than the others by the fact that they threw the rail against his bar; and the first warning he had was when the rail struck his bar and threw the top end of the bar over and it hit him on the head; after which he was taken into the caboose; his neck, head, shoulders, and back hurt; he did not know and could give no estimate of how long he stayed in the caboose; the boys doctored his head and washed the blood away and he went on back doing the work, went back to see if they would let him go ahead working; he went on the railroad toward Hartford, Ark., and back to Muskogee the next day; two or three days later he went to the railroad physician for an examination; the injury produced a scar on his head (pointing it out to the jury); the blood he spoke of before was from the wound on his head; his nose was bleeding when he went to see the doctor and it was not accustomed to bleeding; the doctor examined his head and prescribed some medicine, some kind of liniment, which he got and applied as prescribed; the doctor told him his injury would not amount to anything, and he could go ahead; so he went back to the same kind of work, but did not work continuously; he worked for Mr. Smith doing surfacing in a large gang until the work was completed; there was a change in his physical condition after he got hurt; he did not remember just when he had the first dizzy spell, fainting spell, or fit; but he did not, at any time before he was injured, have fits or spells similar to the ones he had suffered since the injuries.

The propositions argued by the defendant are alleged errors of the court in overruling the demurrer to the evidence of the plaintiff, in refusing to instruct the jury to return a verdict for the defendant, in admitting testimony of the plaintiff over objections of the defendant, and in giving certain instructions and refusing to give certain requested instructions.

We have made a thorough examination of the evidence of the plaintiff in this case, and hold it was sufficient to justify the court in overruling the demurrer of the defendant thereto, and that the court did not err in refusing to instruct the jury to return a verdict for the defendant.

The defendant next complains about the court admitting testimony of the plaintiff over the objections of the defendant. On direct examination of the plaintiff the following occurred:

"Q. Lee, what I am trying to get at, was the rail brought any closer to you before they threw it, than the other rails had been brought? Mr. Swan: Objected to for the reason it is incompetent, irrelevant and immaterial and assuming a state of facts not in evidence and it is repetition. The Court: He may answer it, if he knows. Q. Answer the question, Lee. Mr. Swan: Note our exception. A. It could have been. The rails were not piled in the pile even, see, and the boys picked it up and walked directly in line and threw it— Q. Now, just wait a minute. Tell what happened. A. Well, it struck me. Q. Just a minute— Mr. Swan: Objected to for the reason it is incompetent, irrelevant and immaterial and move to strike it out for the reason it is not responsive to the question. The Court: The objection is overruled. Mr. Swan: Note our exception. Q. Go ahead. A. They picked it up and walking directly in line and threw it on my car and the rail came close to my bar and struck it. Mr. Swan: Objected to—same objection. The Court: The objection is overruled. Mr. Swan: Note our exception."

The defendant argues:

"The witness' testimony shows clearly that he did not see the men walking with the rail and he was not qualified or competent to answer the question. In answering it as he did, he was not testifying to a fact within his knowledge but merely his conclusions. He had just testified: 'I was watching those on the car and wasn't paying any attention to the rails the boys were coming up to the car with and when they threw the rail the first feeling I had the rail was coming and going to strike me was the jar on the bar.' He had been asked the following question: 'Was that rail brought any closer down than the others were?' and he answered it as follows: 'Well, I was performing my duty and wasn't watching that'."

And the defendant concludes:

"While in spite of the repeated attempts by leading and other questions to have the plaintiff testify this rail was thrown closer to him than the others had been, the witness did not and would not so testify, it was error to permit the witness to answer

the questions after he had testified to facts showing he did not know the answer."

The defendant contends the witness did not know about the matters asked him by the attorney, for the reason he had previously testified that he was watching the rails that were on the car and did not see the rail that was thrown against the bar he was holding in his hands. It will be observed from the record, when the objection was raised, the court in ruling on that question said: "He may answer it if he knows." The record in this case discloses that the plaintiff, after straightening the last rail thrown on the car by the gang prior to the one which struck his bar, placed the end of the bar upon a knuckle immediately in front of him and at the time his bar was hit by the rail he had it in the same position that it was during the time the other rails were thrown on the car, therefore, showing the only way the witness would know the rail was thrown closer to him than the other rails would be by virtue of the bar being hit. That is knowledge acquired by the witness through one of his senses, and is classified as primary evidence; therefore, the same was properly admitted by the trial court.

The defendant next complains about certain instructions given by the court. It is a well-settled rule of law by this court that all the instructions given by the court should be considered together and in their entirety, and when so considered, if they state the law clearly and without conflict, it is sufficient, although one or more, standing alone, might be incomplete.

We therefore conclude that the instructions given to the jury with reference to the issues involved for its consideration fairly cover the facts and the law governing the case, and that no reversible error appears from the giving of the instructions complained of and the refusing to give the requested instructions of the defendant.

In order for the plaintiff to recover in this case it was necessary for him to prove that his injury resulted in whole or in part from the negligence of the defendant, and that such negligence was either the sole or concurring cause of the injury.

These issues were submitted to the jury under proper instructions by the court, and this court has always followed the rule that where the evidence reasonably tends to sustain the verdict, and when the jury has been properly instructed as to the law, and a motion for a new trial has been denied, and the verdict of the jury approved by the trial court, the Supreme Court will not invade the province of the jury to weigh the evidence and disturb the verdict.

The other contentions of the defendant of errors committed by the trial court are without merit. The judgment of the trial court is, therefore, affirmed.

Defendant herein executed a supersedeas bond superseding said judgment pending this appeal, a certified copy of same being incorporated in the case-made. The plaintiff asks that judgment be rendered on said bond; judgment, therefore, is rendered against the sureties on said bond for the amount of the judgment, including interest and costs.

McNEILL, C. J., OSBORN, V. C. J., and BAYLESS and PHELPS, JJ., concur.